IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:00-cv-55 F(1)

**FILED**

SHERRI WRIGHT BUFFKIN, )
)
      Plaintiff, )
)
v. )    **COMPLAINT**
)    (Jury Trial Demanded)
THE SMITHFIELD PACKING )
COMPANY, INCORPORATED, and )
JERE NULL, )
)
      Defendants. )

Sherri Buffkin, for her Complaint, alleges and says:

## PARTIES

1. Plaintiff Sherri Buffkin ("Plaintiff" or "Ms. Buffkin") is a citizen and resident of Bladen County, North Carolina.

2. Defendant Smithfield Packing Co., Inc. ("Smithfield," "the Company" or "Defendant Smithfield") is a Virginia corporation doing business in North Carolina. Smithfield in engaged in the business of hog processing.

3. On information and belief, Defendant Jere Null ("Defendant Null" or "Mr. Null") is a citizen and resident of Smithfield, Virginia.

## JURISDICTION and VENUE

4. The jurisdiction of the Court is invoked pursuant to 29 U.S.C. § 1331 and the principles of supplemental jurisdiction.

5. Venue is proper within the Eastern District of North Carolina because the claims herein arose in this judicial district and the Plaintiff and Defendant Smithfield reside or are doing business in this judicial district.

## FACTS

6.  Ms. Buffkin was employed by Smithfield at its Tar Heel, North Carolina plant from September 1992 until September 1998. Ms. Buffkin was initially employed as an hourly warehouse employee.

7.  Shortly after her initial hiring, Ms. Buffkin was promoted to a position as crew leader.

8.  In 1994, Ms. Buffkin was promoted again, this time to Supervisor.

9.  Ms. Buffkin was promoted to a Superintendent position in or about July 1996.

10. Toward the end of 1996, Ms. Buffkin was promoted to Production Support Manager.

11. Throughout her career at Smithfield, Ms. Buffkin received excellent performance reviews, and was praised for her work. On information and belief, for three consecutive years (1995-1997), Ms. Buffkin received the highest raise in the Tar Heel plant, by percentage.

12. Defendant Jere Null was Comptroller for Smithfield's Smithfield, Virginia plant during the first half of 1995.

13. In or about March 1995, Ms. Buffkin engaged in a single consensual sexual encounter with Mr. Null. At the time, Mr. Null was not Ms. Buffkin's supervisor.

14. The day following that encounter, Ms. Buffkin indicated to Mr. Null that the sexual encounter had been a mistake and could not happen again.

15. Despite Ms. Buffkin's refusal to engage in a continued affair, Mr. Null continued to ask Ms. Buffkin for dates and to pressure her in other ways to engage in a romantic relationship with him.

16. In July 1995, Mr. Null became General Manager of the Tar Heel plant where Ms. Buffkin worked.

17. After Mr. Null transferred to the Tar Heel plant, Ms. Buffkin began reporting to Mr. Null.

2

18. Thereafter, Mr. Null continued to engage in unwelcome sexual conduct toward Ms. Buffkin.

19. The unwelcome conduct engaged in by Mr. Null over the remaining years of Ms. Buffkin's employment included, but was not limited to:

    a. kissing and attempting to kiss Ms. Buffkin, including but not limited to unwelcome kissing of Ms. Buffkin in the hydraulic room, and in a conference room at the plant. Mr. Null also attempted to kiss Ms. Buffkin on various occasions in his office and in an elevator.

    b. repeatedly calling and paging Ms. Buffkin for personal and not work-related reasons. Mr. Null left coded messages on Ms. Buffkin's pager that indicated "I love you" and similar messages.

    c. giving Ms. Buffkin gifts inappropriate to a professional relationship. For example, Mr. Null indicated that certain jewelry that he gave Ms. Buffkin was meant to express his love for her.

    d. continually seeking to engage Ms. Buffkin in a romantic relationship, and continually pursuing time alone with Ms. Buffkin. If Ms. Buffkin failed to return Mr. Null's calls or go to dinner with him, Ms. Buffkin's job would be made more difficult.

    e. regularly expressing sexual and romantic feelings and intentions towards Ms. Buffkin.

    f. commenting on Ms. Buffkin's hair and clothing, including asking her why she was not wearing shorts.

    g. on information and belief, telling other employees that he and Ms. Buffkin were engaged in an affair.

    h. exhibiting possessiveness of Ms. Buffkin and attempting to curtail her friendship with another male employee. Mr. Null told Ms. Buffkin that she had to make a choice because he (Mr. Null) was General Manager and her career could

not advance without him. Ms. Buffkin suffered retaliation if Mr. Null found that she had been speaking with the male employee with whom he did not want Ms. Buffkin to associate.

　　　　i.　　refusing to discuss matters other than personal matters and his feelings for Ms. Buffkin.

　　20.　　Mr. Null's repeated and persistent advances were extreme and pervasive and substantially altered the conditions of Ms. Buffkin's employment from July 1995 up until her termination in September 1998.

　　21.　　On repeated occasions after March 1995 and through August 1998, Ms. Buffkin told Mr. Null that she did not want a sexual or romantic relationship with him.

　　22.　　Ms. Buffkin also told Mr. Null she did not want the gifts Mr. Null gave her. Ms. Buffkin gave away gifts from Mr. Null to other employees and told Mr. Null that she had done so, and that she could not be bought.

　　23.　　In May 1997, Ms. Buffkin sought to remove herself from Mr. Null's control by asking the Vice President of Purchasing to allow Ms. Buffkin to report to her rather than to Mr. Null. Despite the fact that Ms. Buffkin thereafter reported to the Vice President of Purchasing regarding purchasing matters, Ms. Buffkin still reported to Mr. Null with regard to other business matters.

　　24.　　Mr. Null continued to make regular contact with Ms. Buffkin, telephoning or paging her on an almost daily basis for non-work-related reasons.

　　25.　　Mr. Null continued to pressure Ms. Buffkin for a relationship until shortly before her termination. For example, in February 1998, Mr. Null called Ms. Buffkin into his office and told her that he was going to do nothing for the next four weeks but make her fall in love with him.

　　26.　　In or about March 1998, Ms. Buffkin told Plant Manager Larry Johnson that she could not work for Mr. Null because of his failure to discuss business on a professional rather than personal level.

4

27. In July or August 1998, Ms. Buffkin reported to Mr. Johnson that she could not have business conversations with Mr. Null because he insisted on trying to make any conversation personal.

28. Mr. Johnson's response was to have Ms. Buffkin discuss business matters with him rather than with Mr. Null.

29. Mr. Null's conduct continued unabated after Ms. Buffkin made her complaints to Larry Johnson.

30. Despite Ms. Buffkin's complaints to Mr. Johnson and her rejection of Mr. Null's overtures, Ms. Buffkin continued to endure continual pressure and harassment from Mr. Null for a sexual relationship.

31. Into late August 1998, Mr. Null had continued his sexual harassment and pursuit of Ms. Buffkin. Ms. Buffkin had continued to reject Mr. Null's advances.

32. In late August 1998, in response to one of those rebuffs, Mr. Null told Ms. Buffkin that she had made a fool of him for the last time.

33. Ms. Buffkin took vacation during the week of September 7, 1998.

34. On September 17, 1998, Ms. Buffkin was suspended for one week.

35. Ms. Buffkin was scheduled to return from her suspension on September 25, 1998.

36. On September 23, 1998, Ms. Buffkin received a phone call from Larry Johnson. Mr. Johnson informed Ms. Buffkin that her employment with Smithfield was terminated.

37. Mr. Null participated in the decision to discharge Ms. Buffkin, and interfered with Ms. Buffkin's employment with malice and without justification.

38. On information and belief, Mr. Johnson suspended and terminated Ms. Buffkin at Mr. Null's behest or direction and/or because of Mr. Null's influence and authority.

39. Subsequent to Ms. Buffkin's discharge, Smithfield has given various, shifting reasons for Ms. Buffkin's suspension and discharge which were pretexts for discrimination.

40. Defendants suspended and discharged Ms. Buffkin because of her refusal to submit to Mr. Null's desire for a sexual relationship with her or to tolerate Mr. Null's persistent pursuit of a romantic relationship.

**FIRST CLAIM FOR RELIEF**
(Title VII: Hostile Environment and *Quid Pro Quo* Sexual Harassment and Discharge)
(Defendant Smithfield)

41. Plaintiff realleges and reincorporates herein paragraphs 1 - 40 above.

42. Plaintiff has satisfied all procedural and administrative requirements of Title VII of the Civil Rights Act of 1964, as amended, by filing a timely charge of discrimination with the Equal Employment Opportunity Commission, receiving a Right to Sue letter and filing this Complaint within 90 days of receiving her Right to Sue letter.

43. Plaintiff was subjected to severe and pervasive sexual harassment, which altered the conditions of her employment. Plaintiff was subjected to sexual harassment that a reasonable person would find hostile and abusive, and that Plaintiff herself found hostile and abusive.

44. Plaintiff was discharged because of her refusal to acquiesce in Defendant Null's sexually harassing conduct and her refusal to submit to Defendant Null's sexual demands, and was therefore subjected to *quid pro quo* sexual harassment and discrimination.

45. Plaintiff was subjected to discriminatory treatment and harassment, and was discharged from her employment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*

46. Defendants acted with malice or reckless indifference to Plaintiff's federally protected rights.

47. As a direct and proximate result of Defendants' actions, Ms. Buffkin has suffered pecuniary and non-pecuniary losses, including but not limited to: lost wages and fringe benefits, costs and expenses, economic hardship including damaged credit and bankruptcy, mental stress and anguish, inconvenience, humiliation, and embarrassment.

## SECOND CLAIM FOR RELIEF
(Wrongful Discharge in Violation of Public Policy)

48. Plaintiff realleges and reincorporates paragraphs 1 - 47 above.

49. It is against North Carolina public policy to discriminate in employment on the basis of gender, including *quid pro quo* sexual harassment.

50. It is against North Carolina public policy to discharge or discipline an employee for refusing to accede to sexual demands of a supervisor, or to require sexual favors or tolerance of sexual harassment as a *quid pro quo* for continued employment.

51. Plaintiff was discharged in violation of North Carolina public policy.

52. Defendants' actions in wrongfully discharging Plaintiff in violation of North Carolina public policy were malicious, willful and wanton, and such malicious, willful and wanton conduct was participated in and condoned by Defendant Smithfield's management employees.

53. As a direct and proximate result of Defendants' actions, Ms. Buffkin has suffered pecuniary and non-pecuniary losses, including but not limited to: lost wages and fringe benefits, costs and expenses, economic hardship including damaged credit and bankruptcy, mental stress and anguish, inconvenience, humiliation, and embarrassment.

## THIRD CLAIM FOR RELIEF
(Intentional Infliction of Emotional Distress)

54. Plaintiff realleges and reincorporates paragraphs 1 - 53 above.

55. Defendants Smithfield and Null engaged in extreme and outrageous conduct toward Ms. Buffkin, as described above.

56. In addition to its own extreme and outrageous conduct, Defendant Smithfield ratified Defendant Null's conduct, including his sexual harassment of Plaintiff, by failing to rectify Defendant Null's sexually harassing conduct.

57. Defendants' extreme and outrageous conduct was intended to and did cause Ms. Buffkin severe emotional distress.

58. Defendants' intentional infliction of emotional distress was done with malice, and was willful and wanton, and such malicious, willful and wanton conduct was participated in and condoned by Defendant Smithfield's management employees.

**FOURTH CLAIM FOR RELIEF**
(Tortious Interference with Contract: Defendant Null)

59. Plaintiff realleges and reincorporates paragraphs 1 - 58 above.

60. Defendant Null wrongfully interfered with Plaintiff's employment because of Plaintiff's refusal to accept Defendant Null's sexual advances, and not for any legitimate business purpose.

61. Defendant Null's interference was malicious, willful and wanton and without legitimate justification.

62. As a direct and proximate result of Defendants' actions, Ms. Buffkin has suffered pecuniary and non-pecuniary losses, including but not limited to: lost wages and fringe benefits, costs and expenses, economic hardship including damaged credit and bankruptcy, mental stress and anguish, inconvenience, humiliation, and embarrassment.

WHEREFORE, Plaintiff respectfully prays:

1. That the Court declare that the actions of the Defendants were in violation of Title VII of the Civil Rights Act of 1964, as amended, and North Carolina common law;

2. That the Plaintiff recover from the Defendants compensatory damages;

3. That the Plaintiff recover from the Defendants punitive damages;

4. That Plaintiff have a trial by jury on all issues so triable;

5. That the costs of this action, including a reasonable attorneys fee, be taxed to Defendants; and

6. That Plaintiff have such other and further relief as the Court may deem just and proper.

8

This 22nd day of March, 2000

                                        GRAFSTEIN & WALCZYK, P.L.L.C.

                                        Lisa Grafstein
                                        NC Bar No. 22076
                                        19 West Hargett Street, Suite 801
                                        Post Office Box 1699
                                        Raleigh, North Carolina 27602
                                        Telephone: (919) 833-7722
                                        Facsimile: (919) 833-3008
                                        Attorney for Plaintiff